## ROBERTS, RECEIVER, ET AL. *v.* NEW YORK CITY ET AL.

No. 546.   Argued April 2, 3, 1935.—Decided April 29, 1935.

*Mr. Charles E. Hughes, Jr.,* with whom *Messrs. E. Myron Bull, Carl M. Owen, J. Osgood Nichols, Harold C. McCollom, Martin A. Schenck, Charles Franklin,* and *George Welwood Murray* were on the brief, for petitioners.

266

*Mr. Paxton Blair,* with whom *Mr. Joseph F. Mulqueen, Jr.,* was on the brief, for the City of New York, respondent.

*Mr. Wm. D. Mitchell,* with whom *Messrs. Albert S. Wright* and *Ellwood Thomas* were on the brief, for Robert Walton Goelet et al., respondents.

*Mr. Wm. H. Page,* with whom *Mr. Richard M. Page* was on the brief, for Bowman Biltmore Hotels Corp. et al., respondents.

*Messrs. Frank C. Laughlin* and *Spotswood D. Bowers* submitted for Corn Exchange Bank, respondent.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The 42nd Street spur of the elevated railroad system in the City of New York has been condemned for the purpose of demolition in proceedings duly instituted by officials of the city government. The fee owner of the spur, a receiver, a lessee, and trustees under mortgages are dissatisfied with the award of damages. The question is whether property interests have been taken without

compensation in violation of the restraints of the Fourteenth Amendment.

The length of the demolished structure was about nine hundred feet. At the east it was connected with the elevated station at 42nd Street and Third Avenue. At the west it had a terminal on Park Avenue opposite the Grand Central Station. For a number of years traffic upon the spur had been dwindling, especially so since the completion of the subways, receipts being less than the cost of operation. Traffic became so light that the spur ceased to contribute value to the business of the railroad, either as an independent unit or as a feeder to the system. With these developments a movement to take the structure from the highway acquired rapid headway. Travelers on 42nd Street, afoot or in vehicles, were impatient of obstructions that had ceased to be useful. Lot owners, contiguous to the railway and nearby, looked forward with eagerness to the removal of an unsightly edifice in the expectation of enhancing the value of their lots. The city too had an interest in the growth of taxable values as well as in the promotion of the safety of the streets. In 1919, the legislature of New York came to the relief of city, lot owners and travelers through the adoption of a statute. By Chapter 611 of the Laws of 1919, the Public Service Commission was empowered to determine whether the spur and its appurtenances were "necessary and convenient for the public service, or whether, even if necessary and convenient, such tracks, structure, station and appurtenances" constituted "an impediment or obstruction to the public street." Upon the certificate of the Commission as to the existence of either of these conditions, the city might condemn "the rights, easements and franchises of the said Manhattan Railway Company" through appropriate proceedings. See also L. 1923, c. 635.

At the end of a full hearing the Public Service Commission found and certified that the spur was no longer a public convenience and necessity, and also that it was an impediment and obstruction to the public use of the street. No appeal to the courts was taken by the company. Thereupon, the City of New York by its Board of Estimate and Apportionment resolved that condemnation proceedings should be begun. The resolution, adopted November 23, 1923, called for the condemnation of the structure of the spur and of all easements and franchises appurtenant thereto, title to vest in the city on December 7 of that year. The resolution was followed by a suit under the applicable statute for the determination of the damages to be paid to the owners of the property condemned. The trial court made an award in the sum of $975,438, with interest, stating the component items in an opinion. 126 Misc. (N. Y.) 879; 216 N. Y. S. 2. Cross-appeals followed to the Appellate Division of the Supreme Court, the city and abutting lot owners insisting that the award was too high, and the spur owner and its allies insisting that the damages were too low and that property had been taken without due process of law. *United States Constitution, Fourteenth Amendment.* Three items were in controversy: (1) the value of the franchise; (2) the value of the structure; and (3) the value of certain rights or privileges characterized as private easements. As to item (1), the ruling of the Appellate Division was that the franchise was without value, and had become a source of loss instead of gain; as to item (2), the ruling was that the structure was without value beyond what it would be worth as scrap when taken down; and as to item (3), the ruling was that the private easements must be paid for at not less than their value as judicially determined at the time of their acquisition, but that the evidence did not justify a finding that their value was any greater. *Matter of City of New York*

(*Manhattan Railway Co.*), 229 App. Div. 617; 243 N. Y. S. 665. The cause was remitted to the trial court, which heard additional evidence and made a new decree. As a result of that decree the value of the private easements was fixed at $539,117.41; the scrap value of the structure was fixed at $235; the value of the franchise nothing. 143 Misc. (N. Y.) 129; 257 N. Y. S. 37. There were cross-appeals to the Appellate Division, which affirmed without opinion (238 App. Div. 832; 262 N. Y. S. 973), and then to the Court of Appeals, where there was an affirmance by a divided court. 265 N. Y. 170; 192 N. E. 188. This court granted a writ of certiorari at the instance of the Receiver of the railway company and those allied with him in interest. 293 U. S. 554.

A statute of New York in force at the taking of the spur directs the court to " ascertain and estimate the compensation which ought justly to be made by the City of New York to the respective owners of the real property to be acquired." Charter of New York City, § 1001; L. 1915, c. 606. Cf. L. 1923, c. 635. Such a system of condemnation is at least fair upon its face. " If there has been any wrong done it is due not to the statute but to the courts having made a mistake as to evidence, or at most as to the measure of damages." *McGovern* v. *New York City*, 229 U. S. 363, 370. Not every such mistake amounts to a denial of constitutional immunities, though the outcome is to give the owner less than he ought to have. In condemnation proceedings as in lawsuits generally the Fourteenth Amendment is not a guaranty that a trial shall be devoid of error. *West Ohio Gas Co.* v. *Public Utilities Comm'n* (*No. 1*), 294 U. S. 63, 70. To bring about a taking without due process of law by force of such a judgment, the error must be gross and obvious, coming close to the boundary of arbitrary action. The test has been differently phrased by different judges and in different contexts. At times we find the statement that the

278

Constitution is not infringed unless there has been " absolute disregard " of the right of the owner to be paid for what is taken. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 246; *Backus* v. *Fort Street Union Depot Co.,* 169 U. S. 557, 565; *Appleby* v. *Buffalo,* 221 U. S. 524, 532. At other times we are told that due process is not lacking unless " plain rights " have been ignored, with a reminder that much will be overlooked when there is nothing of unfairness or partiality in the course of the proceedings. *McGovern* v. *New York City, supra,* at p. 373. From the very nature of the problem these phrases and others like them are approximate suggestions rather than scientific definitions. In last resort the line of division is dependent upon differences of degree too subtle to be catalogued. *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355; *Klein* v. *Board of Supervisors,* 282 U. S. 19, 23. Cf. *Davidson* v. *New Orleans,* 96 U. S. 97, 104. One cannot hope to mark its bearings in a sentence or a paragraph. Enough for present purposes that when the hearing has been full and candid, there must ordinarily be a showing of something more far-reaching than one of dubious mistake in the appraisal of the evidence. Due process is a growth too sturdy to succumb to the infection of the least ingredient of error. " It takes more than a possible misconstruction by a court to make a case under the Fourteenth Amendment." *Seattle, R. & S. Ry. Co.* v. *Linhoff,* 231 U. S. 568, 570.

In the setting of this background we approach the consideration of the rulings that are here assigned as error.

1. First in importance is the appraisal of the private easements.

The franchise to maintain an elevated railway " with an interest in the street in perpetuity " (*People* v. *O'Brien,* 111 N. Y. 1, 38; 18 N. E. 692) dates from September 7, 1875. After the building of the road controversies developed between the company and abutting

owners. Out of them grew what came to be known as the elevated railroad lawsuits, " one of the most important and interesting chapters in the history of litigation " in New York. *Powers* v. *Manhattan Ry. Co.,* 120 N. Y. 178, 183; 24 N. E. 295. The foundation stone was laid by the Court of Appeals in *Story* v. *New York Elevated R. Co.,* 90 N. Y. 122, decided in 1882. The doctrine was there announced that appurtenant to lots abutting on a highway are certain private easements—easements of light and air and access—which may not be destroyed or impaired through the construction under legislative sanction of an elevated railroad without payment to the lot owners of the damage to their land and buildings. Many later cases enforced the same doctrine and indeed enlarged its scope, applying it to lots where the fee of the highway was vested in the city. *Lahr* v. *Metropolitan Elevated Ry. Co.,* 104 N. Y. 268; 10 N. E. 528; *Kane* v. *New York Elevated R. Co.,* 125 N. Y. 164; 26 N. E. 278. Cf. *Muhlker* v. *N. Y. & H. R. Co.,* 197 U. S. 544; *Sauer* v. *New York City,* 206 U. S. 536. In submission to these holdings the Manhattan Railway Company extinguished the damage claims of lot owners along many miles of track. It did this by purchase or condemnation or proceedings equivalent thereto, the amount to be paid being determined sometimes by a court, sometimes by agreement. Generally the extinguishment took the form of grants of the easements to the extent that they were affected by the then existing structure, the abutting owners being the grantors and the Manhattan the grantee. Irrespective of the form, the substance of the transaction was that "the railroad merely exhausted the right of the abutting owners to complain because the railroad was in the street and so trespassing on their property." Per Pound, Ch. J., in the present case, 265 N. Y. at p. 180. What was conveyed was the right to persist in a course of conduct that otherwise would have been a wrong.

Even then the process of condemnation or its equivalent did not so obliterate the easements as to leave abutters helpless in the face of new encroachments. If the user was substantially aggravated, as, for example, by an added tier of tracks, there was another right to be extinguished. *Knoth* v. *Manhattan Ry. Co.*, 187 N. Y. 243; 79 N. E. 1015; *American Bank Note Co.* v. *New York Elevated R. Co.*, 129 N. Y. 252, 266; 29 N. E. 302. The company was under a continuing duty to rid its presence in the highway of the character of a trespass as against the title of abutters.

Whether these rights or interests, though easements in the ownership of the abutters, retained the same quality after release or conveyance to the railway, we do not now determine. They are spoken of in many cases as if their quality in the new ownership continued what it was before. See, e. g., *People ex rel. Manhattan Ry. Co.* v. *Barker,* 165 N. Y. 305; 59 N. E. 137; 151; *People ex rel. Manhattan Ry. Co.* v. *Woodbury,* 203 N. Y. 231; 96 N. E. 420. This may have been merely for convenience with the thought that the description was at least sufficiently accurate to serve the case at hand. Elsewhere the same interests are spoken of as " quasi-easements " (*American Bank Note Co.* v. *New York Elevated R. Co., supra,* at p. 272) or by some other and equivalent term. *Matter of City of New York (Manhattan R. Co.),* 126 Misc. 879, 901; 216 N. Y. S. 2; 229 App. Div. 617, 625; 243 N. Y. S. 665; *Stevens* v. *New York Elevated R. Co.,* 130 N. Y. 95, 101; 28 N. E. 667. After acquisition by the railway, they are not susceptible of separation from the ownership of the franchise. *Kernochan* v. *New York Elevated R. Co.,* 128 N. Y. 559; 29 N. E. 65; *Drucker* v. *Manhattan Ry. Co.,* 213 N. Y. 543; 108 N. E. 74; *Heard* v. *Brooklyn,* 60 N. Y. 242.* They are not easements in gross assignable to strangers gen-

---

* Many decisions are collected in 40 Yale L. J. 779, 1074, 1309.

erally. 265 N. Y. at p. 181. They may be factors to be considered in determining the value of the franchise while the road is in operation, for they are effective as a release from liability for past or future damages. This is very far from saying that they contribute elements of value when operation has been proved to be impossible except at a continuing loss. Still less does it connote a value equivalent to the estimated present cost of condemning them anew.

We have said that there will be no attempt in this court to classify the rights acquired by the company as easements or as something else. For present purposes we accept the ruling of the state court that irrespective of their precise nature they had a value to be paid for upon the termination of the franchise and the removal of the structure by force of eminent domain. If all this be assumed, the petitioners fall short by a long interval of making out a defiance of constitutional restraints. Their argument, it seems, is this: property that is to be condemned must be paid for in accordance with the value at the time of the taking; these easements when acquired about half a century ago had a value then judicially determined of about half a million dollars; owing to changes in the neighborhood the same easements, if acquired in 1923, would have cost $3,600,000; an award has been made for the first amount only; the difference between the first amount and the second is an increment of value condemned without requital.

The argument misconceives the action of the courts below. The courts have not held that an increment of value in the easements or in anything else may be condemned without requital. What they have held is merely this, that there is no basis in the evidence for assigning any determinate value to the ownership of the easements in excess of the value belonging to them when they were acquired by the company. Even if there was error here

in the interpretation of the record, it was not so gross or obvious as to justify a holding that the restraints of the Constitution were forgotten or ignored. But in truth there was no error, or none to the prejudice of the owners of the property condemned. Much could be said in support of the position that the value of the so-called easements was nothing more than nominal. If so, the petitioners have been overpaid by more than half a million dollars. We do not go into that question now, for the city and the abutters are not petitioners in this court, and must acquiesce in the award as made. Problems open in the state court and there considered in the opinions (see especially the dissenting opinion in 265 N. Y. at p. 183) are beyond our jurisdiction here. Enough for present purposes that the award is not too low, though perhaps it is too high. Excess is not an error of which the owner may complain.

Too low it certainly is not. "The question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53. If we assume these easements to be property, what were they worth to the railway in 1923? The petitioners do not urge that it was practicable to find a buyer who would pay for the easements in connection with the franchise and with a view to continuing the operation of the road. The spur had proved to be a failure, a mere impediment to public travel. Substantial prices are not paid for the privilege of conducting a business at a loss. The petitioners do urge, however, that abutters would have been willing to pay for an abandonment of the road, and that such abandonment would have been equivalent to the surrender of the easements or to a deed of reconveyance. Voluntary abandonment was permissible (New York Railroad Law, § 237; also L. 1917, c. 788) until the franchise with its appurtenances was taken over by the city.

From this the conclusion is drawn that the easements are worth what the abutters would have paid for them. Implicit in such an argument are assumptions that would be worthy of scrutiny if the need for scrutiny were here. The inquiry would then be whether easements or quasi-easements inseparable from a franchise must be paid for as property at the peril of infringing the Fourteenth Amendment when their value for sale presupposes the abandonment of the franchise to which they are appurtenant. To carry the Amendment to that point approaches, though it may not touch, the acceptance of the nuisance value which Hough, J., on one occasion excluded from the reckoning with words of trenchant emphasis. *Consolidated Gas Co.* v. *New York City*, 157 Fed. 849, 874. For the time being and provisionally we put aside these doubts, resolving in favor of the company whatever problems they suggest. Granting that the value of the easements is whatever abutters would have paid for a surrender of the franchise, how much would this have been?

A sale to abutters was impracticable unless all or nearly all united. One owner could gain nothing from a reconveyance of the easements appurtenant to his lot without a like reconveyance to others along the line of the invading structure. The spur would have to come down altogether or not at all. The notion is almost fantastic that there would have been union among the owners upon a price of $3,600,000 or any comparable figure. Even if the value of their lots were to be enhanced to that extent, they would be no better off as the outcome of the bargain than they already were without it, and would be risking a huge outlay. They would be doing this though they denied that the easements were the kind of property for which they could be forced to pay a dollar if the case were brought into a court. In such circumstances union among the abutters was a shadowy and distant chance. *New*

*York City* v. *Sage,* 239 U. S. 57, 61; *Olson* v. *United States,*
292 U. S. 246, 256. " What the owner is entitled to is the
value of the property taken, and that means what it fairly
may be believed that a purchaser in fair market conditions
would have given for it in fact—not what a tribunal at a
later date may think a purchaser would have been wise to
give, nor a proportion of the advance due to its union with
other lots." *New York City* v. *Sage, supra,* at p. 61. Dis-
cordant voices among the group would surely have been
raised in protest if an attempt had been made by amicable
treaty to get rid of the spur at the value put upon it by
the railway. Perhaps the abutters would have paid some-
thing. But how much would it have been? The courts
below have found in the evidence no basis for the belief
that the price would have exceeded the value of the ease-
ments as judicially ascertained at the time of acquisition.
229 App. Div. at p. 629; 265 N. Y. at p. 181. We cannot
say that this was error. Still less can we say that some
other and higher figure was established with such persua-
sive power that the Constitution of the United States has
been flouted in the refusal to accept it.

2. Objections are made by the petitioners to the valua-
tions of the structure, the franchise, and the public ease-
ments in the highway.

The structure was appraised as junk, the city having
undertaken to bear the cost of removal. Such an ap-
praisal might be too low were it not for the award for the
private easements. To realize the value of those ease-
ments, an abandonment of the spur was necessary. "The
railroads could not release their rights to the abutting
owners and continue to operate their railroads in the
street." 265 N. Y. at p. 181. The structure in the cir-
cumstances had no value except as scrap.

The franchise was without value for reasons already
stated, or so the triers of the facts might hold without

departing from the restraints of the Constitution of the nation.

With the value of the franchise gone, the public easements in the street, as distinguished from the private ones, had a worth that was merely nominal, at least for any showing to the contrary in the pages of this record.

Other objections have been considered without inducing a conviction that the petitioners have been the victims of any arbitrary rulings.

The judgment is *Affirmed.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.