## UNITED STATES v. CERTAIN LANDS LOCATED IN TOWNS OF WOODBURY AND HIGHLANDS et al.

District Court, S. D. New York.

Aug. 11, 1943.

Opinion Adhered to on Rehearing Oct. 19, 1943.

See 52 F.Supp. 314.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of United States, for petitioner-plaintiff.

White & Case, of New York City (Adrian D. Stevenson, Orison S. Marden, and Charles J. Fay, all of New York City, of counsel), for defendant Forest of Dean Iron Ore Co.

Kopald & Haft, of Highland Falls, N. Y., for defendant Union Free School Dist. No. 2 of Town of Highlands.

BRIGHT, District Judge.

The court is asked to fix "just compensation" for the taking by the Government on March 27, 1942, of 308.76 acres, being Parcel III, Part "D", called the mine property, and Parcel III, Part "E" containing 4.94 acres called the railroad right of way, both belonging to the defendant Forest of Dean Iron Ore Company. Included in this area is Parcel IV, the school house site, of .79 acres, upon which about twenty years ago was built a school house now belonging to the defendant Union Free School District No. 2 of the Town of Highlands.

A full covenant deed of that school house plot was made by the Forest of Dean Iron Ore Company to the School District on August 1, 1917, which conveyed the lot by metes and bounds, and contained this clause: "Conveying surface rights only and to be used for school purposes only, and if for any reason the school should be abandoned or discontinued permanently, the rights conveyed shall revert back to the Forest of Dean Iron Ore Company, their successors or assigns. All mineral rights of every name and nature reserved." Upon the trial of the proceeding, the Forest of Dean Company conceded and stipulated that whatever award was made for the school building and surface rights in the land should belong to the School District. It made claim to whatever iron ore there remained in the supporting pillars under that land.

I have viewed the property on three different occasions, twice in company with the attorneys for the respective parties.

Mine Lake, of 24.6 acres, is situated upon the mine property, and in my opinion, enhances its value.

The Forest of Dean Company introduced proof upon the subject of value under three theories—(1) that the iron ore left in the pillars of the mine slope, if taken out and marketed, would show a profit of over $500,000; (2) that its property was capable of being developed into camp and recreation sites, and from that aspect, would be worth from $200,000 to $283,000; and (3) that the existence of Mine Lake upon the property made it available as a source of water supply and water power, and as thus used would be worth $150,000.

In every aspect of the subject, the testimony of the experts called on both sides is irreconcilable and widely divergent, and it is obvious that the three theories advanced are inconsistent. Thus if mining operations were conducted upon the property, it can hardly be said there would be a market for camp and recreation sites; and certainly not for a domestic water supply. If the property could be developed into camp and recreation sites, there could not be a domestic water supply in the same vicinity. The health of the users of the water would necessarily preclude the use of its watershed for any such purpose. There has been no development of camps or new construction of any kind since the mine closed in 1931.

The property is situated in the mountains surrounding the West Point Reservation. It has never been used for farming purposes, it is rocky in many parts, mountainous in others, swampy in others, and intersected by roads used in the mining operations as well as by the so-called Mine Road, a town maintained highway. The property has a frontage of about 2400 feet along State Highway No. 5328, and is intersected by the right of way of the Orange & Rockland Light & Power Company.

It was shown that mining upon the property in question first began in the early or middle part of the 18th century, and continued until November 1931. The mine was not operated after that date, but pumping to keep down the water in it continued until May 1936. The Forest of Dean Company has not operated the mine since 1909, in which year it leased its property to the Fort Montgomery Mining Company, which operated it until 1931. The lease expired on September 1, 1935.

Apparently the mine tunnel or slope which is about 1800 feet in length on the Forest of Dean property was mined out by 1906, and further mining operations were continued under the Fort Mongomery Company and Clark properties.

There were a number of buildings upon the property in which were housed the employees, the operating officers and the mining machinery. After the commencement of this condemnation proceeding in 1939, all of the mining machinery and equipment was sold, apparently for scrap, at $5 a ton. Many of the buildings were razed, and at the time of the declaration of taking and the entry of the Government into possession on March 27, 1942, practically all of the buildings were empty, in dilapidated condition and useless.

During the course of the mining operations, pillars of ore and rock were left at varying distances in the mine slope and these pillars still exist. It was estimated without serious contradiction that there were 275,078 tons of material in them from which from 140,000 to 183,333 tons of ore could be removed. That ore had been assayed and showed 63% iron. There was the usual dispute among the experts called. Those for the mining company testified that the pillars could be removed at cost of about $3.17 per ton, that the ore so removed could be marketed at $6 per ton, at a profit of $2.83 per ton, in the aggregate $518,832.39. To do so would require the purchase and installation of machinery and equipment and the employment of labor for the operation extending over an estimated period of two years. On the other hand, the expert for the Government testified that the pillars could not profitably be removed, that it would take five years to remove them, and that the cost of production would be $7.75 per ton, with a consequent loss of $1.75 per ton. No testimony was offered to show to what extent, if any, the existence of the pillars in the mine slope would enhance the value of the land taken. Defendant's witnesses did not give any testimony upon that subject, and plaintiff's witnesses testified that the existence of the ore in the pillars did not enhance the value of the property. One of the witnesses called by the Forest of Dean Company on the subject of a real estate development stated that in his opinion the market value of the land, cut up into lots and acreage, would be $146,235; and further stated that the buildings fur-

68

ther enhanced the property to the extent of $55,688, a total of $201,923. The other witness called by the same defendant upon the same subject, testified that the land was worth for the purpose of development $221,900, and the buildings $62,050, a total of $283,950.

Each of these witnesses testified that from his point of view, the presence of the minerals upon the property added nothing to its value, nor did the possibility of a water supply or water power. The expert called by the Government testified that in his opinion the market value of the land was $23,000, that most of the buildings detracted from the value because of their dilapidated condition, but several of them enhanced the value to the extent of $2,000, an aggregate of $25,000.

■ Upon the subject of the value of the property for domestic water supply and power purposes, a witness for the defendant testified that the replacement cost of the dam at Mine Lake would be $22,300, and to provide a water supply such as existed would cost $150,000. The expert for the Government stated that there was no demand for any such a domestic water supply, that the Village of Fort Montgomery in the Town of Highlands was not large enough to justify the construction of one, and that the other village, Highland Falls, already was supplied by the Citizens Water Company, a private water corporation having sources of its own; and that the lake has no value as a source of commercial water supply or water power; the West Point Reservation already has its water system. And if it did not, the value of the property for that purpose, in other words, its value to the taker, would not be a criterion of just compensation. Roberts v. New York, 295 U.S. 264–282, 55 S.Ct. 689, 79 L.Ed. 1429; Olson v. United States, 292 U.S. 246–256–261, 54 S.Ct. 704, 78 L. Ed. 1236.

■ The only other testimony offered by the Forest of Dean Company was with reference to the existence of large piles of crushed stone which had been removed from the mine during its operation by the Fort Montgomery Company. It was shown that there were contained in these piles 81,597 cubic yards of stone, which, it was testified, could be marketed at $1.75 per ton, an aggregate of $142,794.75. The Government contends as to this that under the statute under which this proceeding is maintained, it is not authorized to acquire by condemnation anything but real estate; that this crushed stone is not real estate, and no award can be made for it in this proceeding. It was shown by uncontradicted evidence that army engineers have used a large portion of it in the construction of roads, ranges, etc. It is also contended by the Government that the Forest of Dean Company has not shown that it owns the stone; that it was removed by the Fort Montgomery Company, its lessee, who at times sold some of it, and its removal was not from the Forest of Dean property but from the Fort Montgomery and Clark properties. Under the circumstances, I have concluded to accept the contention of the Government that it is not to be considered as having been taken in this proceeding, and to leave the question of what, if anything, shall be allowed for it, for determination in some other action or proceeding.

There remains for consideration the school house site owned by the Union Free School District No. 2 of the Town of Highlands, the title to which has been previously described. The school house upon this tract was and is still well adapted to the property, and was and is a well and strongly built structure of stone foundation and walls, 40 ft. by 62 ft. in dimension, single story, heated by two hot air furnaces, and wired for electricity and telephone. The building was in fair condition, and at the time of the taking was being used by the army engineers as an office. It was testified by witnesses called by the School District that the surface rights in the land were worth $550, and that the cost of reproduction of the building less depreciation was $8,511. The Government's witness appraised it at $3,500 for the building and $100 for the land, and also testified that the roof of the building was in excellent condition, the exterior stone work also, the floors in good condition, and the plaster inside not too good.

■ The testimony in my opinion does not show that the value of the mine property is or has been in any way enhanced by the existence of the mineral pillars in the abandoned mine slope. If there was present all of the value testified to, it seems inconceivable to me that it would not long ago have been retrieved. Obviously, no attempt has been made to do anything of the kind, although mine operations on the property of the Forest of Dean Company ended over thirty years ago. Since 1909

at least the mining operations have been on property belonging to others than the Forest of Dean Company, and yet over half a million dollars in value has remained for some one, if the testimony is to be taken at full value. I cannot imagine that any one seeking to buy this property at the time of the taking would add anything to his offer because of the existence of those pillars, particularly in the absence of any machinery or buildings with which to remove them. There is no proof as to the extent these pillars enhance the value of the property as a whole. United States v. 5 Acres of Land, etc., in Town of Babylon, D.C., 50 F.Supp. 69–71, and cases there cited.

Nor from my knowledge of the terrain, and I have been over it and the land in the vicinity a number of times, can I believe that it lends itself to a real estate development. The prices stated are so fanciful, the various elements entering into a possible realization of money from it are so speculative, and the obvious lack of a market, do not justify an award anywhere near the figures testified to. One has but to walk over the property to see how far from realization such a development could be. It is spotted here and there by buildings, many of which have fallen in, many of them have been razed, and only the foundations remain, and all of them show signs of decay and dilapidation which, together with the existence of an open mine shaft and tunnel would discourage any ordinary buyer from interesting himself in it at all.

Under the circumstances, I make the following awards as of March 27, 1942:

For the land taken 313.91 acres, which includes the railroad right of way, all of which I think should be valued together and excludes the .79 acres of the school house site — $20,000.

I think the existence of Mine Lake upon the property enhances its value to the extent of — 10,000.

Concrete garage shown on claimant's exhibits 38 and 46 — 250.

Devore house shown on claimant's exhibits 31 and 32 and Government's exhibit 31 — 750.

Restaurant building shown on claimant's exhibit 40 and Government's exhibit 37 — 500.

Stone barracks shown on claimant's exhibit 68 and Government's exhibit 52 — $ 250.

Carpenter shop shown on claimant's exhibit 74 and Government's exhibit 55 — 1,000.

Dwelling and garage shown on Government's exhibit 59 and claimant's exhibits 75 and 77 — 1,000.

Concrete change and shower building with iron roof shown on Government's exhibit 57 and claimant's exhibit 79 — 500.

Total — $34,250.

School house building and site shown on claimant's exhibit 30 — 6,000.

Total of all awards — $40,250.