## UNITED STATES v. BUXTON LINES, Inc.

No. 5668.

Circuit Court of Appeals, Fourth Circuit.

Feb. 3, 1948.

Jess H. Rosenberg, Atty., Department of Justice, of Washington, D. C., (Herbert A. Bergson, Acting Ass't. Atty. Gen., George R. Humrickhouse, U. S. Atty., of Richmond, Va., and J. Frank Staley, Sp. Ass't to Atty. Gen., on the brief), for appellant.

William C. Coupland, of Norfolk, Va., (Vandeventer & Black, of Norfolk, Va., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is an appeal by the United States from a decision of the District Court that Buxton Lines, Inc., was entitled to recover from the United States the amount of $4,000 as just compensation for the use of a vessel requisitioned by the United States on a bare-boat basis for a period of four months.

The facts bearing upon the amount of compensation to which the appellee was entitled, may be summarized as follows: The S. S. Norfolk had been constructed in 1900 as a passenger boat for navigation in inland waters. Prior to 1937 she had been operated as a day excursion boat, but in that year she was purchased by the appellee for a price of $7,500. There upon the appellee expended approximately $40,000 for repairs and alterations by which she was converted from a coal-burner to an oil-burner, and was rendered more adaptable to the transportation of cargo.

The appellee was engaged in the business of transporting cargo between Richmond, Virginia, and Norfolk, Virginia, and, in addition to the S. S. Norfolk, also owned the S. S. Richmond, a somewhat smaller vessel. The two vessels made daily trips alternately between these two cities. The appellee also operated a motor trucking line between Hopewell and Petersburg, Virginia, from which it derived approximately 20 per cent. of its gross income.

The appellee's business in the years prior to and during the war was not a profitable one. For the year ending February 28, 1939, it sustained an operating loss on its waterline operations in the amount of $1,322.77; for the year ending February 29, 1940, a loss of $813.63; for the year ending February 28, 1941, a loss of $1,596.37; for the year ending February 28, 1942, a loss of $58,006.06; and for the year ending February 28, 1943, a loss of $33,379.62.

The effect of the war on the appellee's business was disastrous. Most of its water operations were devoted to the carriage of cargo for other lines, and, with the advent of war, the vessels belonging to these connecting lines were requisitioned by the Government, so that the appellee's business was largely destroyed. In January, 1942, the S. S. Norfolk was withdrawn from service and tied up at the appellee's dock in Richmond, Virginia, and in April, 1942, the

S. S. Richmond was similarly withdrawn from service. On April 21, 1942, the Virginia State Corporation Commission granted the appellee's petition that it be allowed to suspend its operations for the duration of the war.

In the latter half of 1942 the War Shipping Administration, on the basis of certain preliminary investigations, determined that the S. S. Norfolk could be used as a troop transport in the Hampton Roads area. Accordingly, on December 15, 1942, the Administration, acting under the authority of 46 U.S.C.A. § 1242, requisitioned the Norfolk. She was then towed to Norfolk and placed in dry dock; but the conversion of the ship to a troop transport seemed to be impracticable and too expensive and she was returned to the appellee in Richmond on April 14, 1943.

With the exception of this brief interval of Government possession, the Norfolk remained tied up in Richmond from the time of her withdrawal from service in January, 1942, to the time of her destruction by fire in September, 1945. During this period the appellee made repeated attempts to sell or to charter her, but these efforts proved unsuccessful and so no income was realized from her. To the contrary, the appellee found it necessary to expend fairly substantial sums of money to maintain her in proper condition. This enforced idleness was not attributable to the fact that she was no longer seaworthy or navigable, although undoubtedly she had depreciated in value during the years, but rather to the fact that as a result of the war and consequent Government regulations and policies, private shipping had come to a virtual standstill and, after her rejection by the Government, no market existed for her.

In March, 1944, the War Shipping Administration tendered the appellee a bareboat charter which fixed compensation at the rate of $100 per month, or a total of approximately $400 for the period of Government possession. The appellee was not satisfied with this offer. Pursuant to 46 U.S.C.A. § 1242, it accepted $299.46 (75 per cent. of the total sum offered) and instituted suit in the District Court to recover compensation at the rate of $83 per day, or a total of $9,960.

The Government's contention is that the appellee is entitled to only nominal compensation, as, for instance, $1. It is said that "The key notion (of just compensation) is indemnity, measured in money, for the owner's loss," Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 691; that the guaranty of just compensation means only "that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken," Seaboard Air Line R. Co. v. United States, 261 U.S. 299, 304, 43 S.Ct. 354, 356, 67 L.Ed. 664; United States v. Miller, 317 .US. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270; and that "the question is, What has the owner lost? not, What has the taker gained.?" Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725. It is argued that since the owner was unable to sell or charter the ship or to realize any income from her either before or after the four months of Government possession, the inference is inescapable that the same market conditions obtained during that interval. Thus, the Government concludes that the appellee lost nothing and is therefore entitled to nothing by virtue of the temporary requisition; and this conclusion is reached despite the fact that the Government itself, through its war-time regulations and policies, destroyed the private shipping market. Indeed it is even argued that the appellee profited from the requisition, since it was relieved of the cost of maintaining the vessel during this period.

These quotations from the opinions of the courts if taken literally support the Government's position; but "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but should not control the judgment in a subsequent suit * * *." Cohens v. Virginia, 6 Wheat. 264, 399, 5 L.Ed. 257.

None of the cases cited by the United States involve the question whether the United States may destroy a private market in the exercise of its legitimate powers and then requisition property without cost for

the period affected by its activities. In United States v. Miller, 317 U.S. 369, 63 S. Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, for example, it was decided that an owner was not entitled to recover the increase in value of land taken which was caused by the authorization of a federal reclamation project; and in Seaboard Air Line R. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664, that interest from the date of the taking of property should be added to the compensation payable to the owner by the United States. In these instances the compensation was measured by the property owner's financial loss; but this is not always the rule for it is settled, on the one hand, that a property owner is not entitled to consequential damages; United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390, and on the other, that the adaptability of property for particular purposes may be considered although the owner did not use it for that purpose. Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206.

In Roberts v. New York City, 295 U.S. 264, 55 S.Ct. 689, 79 L.Ed. 1429, upon which the Government particularly relies, the court upheld a finding that the franchise to operate an elevated railroad had no value, and that it was proper to allow recovery for the structure only on its value as scrap. The basis of this ruling, however, was that it had been determined to abandon the railroad, the Public Service Commission having certified that its continued operation was not in the public interest, and that the Railroad had released certain private easements (for which compensation had been awarded) without which it was not feasible to continue operations. Since the railroad could no longer be operated, the right to do so was insignificant, and for the same reason, the structure had no appreciable value in excess of its value as scrap. It is clear that the decision in that case is not in point here, since the Norfolk could quite easily have been used during the period in question, the only difficulty being the absence of a private market as a consequence of the war and of Government policies.

■ These decisions illustrate the important principle of the law of just compensation that the owner should not profit from the circumstance that his property has been condemned rather than purchased, and that in ascertaining the amount of the award, reference should be made to the same considerations which would have moved the parties had the property been sold in the open market. In short, the pending case should be decided in accordance with the established rule that just compensation is the sum which would probably be arrived at as the result of fair negotiations between an owner willing to sell and a purchaser willing to buy after due consideration of all the elements affecting market value. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236. The purchaser willing to buy may be merely a hypothetical figure, but as long as his absence is not attributable to the fact that the property has no value, his existence is necessarily assumed. Westchester County Park Commission v. United States, 2 Cir., 143 F. 2d 688, 692. There was no private market in the pending case but the ship was navigable and adapted to the carriage of cargo in inland waters and there was at least the demand created by the desire of the United States for her temporary possession and use. The rule is that if there is no private market for the property condemned, resort must be to other data to ascertain the value even though the inquiry may involve what is "at best, a guess by informed persons." United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L. Ed. 336, 147 A.L.R. 55. For example, in Graves v. United States, D. C. W. D. N. Y., 62 F. Supp. 231, where the market for a manufactured article composed of an alloy of metal was impaired or destroyed by governmental wartime restrictions, the court declined to allow the recovery of the ordinary sales price of the articles and fixed the compensation in accordance with the prices paid by the Goverment for copper under the Copper Recovery Program.

■ The determination of the value of the use of the ship during the period of possession by the United States was obviously attended with great difficulty which was not eased by the Government's refusal to offer any estimate of the value and its insistence that the owner was not entitled to any compensation whatever. The Government, however, did point to the owner's

operating losses between 1940 and 1943. It also offered certain estimates ranging from $10,000 to $84,000 as the cost of making the ship suitable for the carriage of Government personnel; and it showed that in 1943 the owner valued the ship at $19,000 * for purposes of taxation, and that in 1944 the owner entered into a contract of sale for $35,000 which the purchaser later declined to perform, suffering a penalty of $2,500 for the privilege.

On the other hand, the owner offered testimony that in 1942 a parole agreement was made for the sale of the ship for $125,000 to a non-resident of United States but that the performance of the agreement was frustrated by the Government's unwillingness that the ship be placed under a foreign flag. The owner also offered testimony of experts who estimated the value of the use of the ship on a bare boat basis at figures ranging from $83 to $150 a day; and that in June, 1941, it was chartered in an emergency for a trip from Norfolk to Boston and return at the rate of $400 a day, which was equivalent to $293 a day on a bare boat basis.

The District Judge, upon all of the testimony, estimated that the boat was worth $50,000 in 1942, and then determined the value of the Government's use by applying a formula employed by the War Shipping Administration in accepting bare boat charters under which from 18 to 25% of the value of the vessel was paid to the owner per annum, depending upon the length of the charter. Taking 24% of the estimated value of the Norfolk, the Judge declared her fair rental value for the four month period to be $4,000. The Government objects to the use of this formula on the ground that prices paid by the United States for similar property in other transactions is not competent evidence in eminent domain proceedings. United States v. Foster, 8 Cir., 131 F.2d 3; United States v. Bailey, 5 Cir., 115 F. 2d 433; United States v. Reynolds, 5 Cir., 115 F. 2d 294. We think, however, that the evidence was pertinent since it was not offered to show the amount which

the Government had paid for other ships but merely to show the existence of a general formula adopted by the parties to ascertain the compensation to be paid in such cases. Upon consideration of the whole matter, we cannot say that the duty imposed upon the District Judge to determine the amount of compensation to be paid by the United States has been improperly exercised, or that the sum fixed is so clearly excessive as to justify a modification of the judgment.

Affirmed.

---

\* Under the decisions, little or no weight should be given to valuations of property used by the owner for taxation purposes. See Bowie Lumber Co. v. United States, 5 Cir., 155 F.2d 225; United States v. Delano Park Homes, 2 Cir., 146 F.2d 473; Johnson & Wimsatt v. Reichelderfer, App.D.C., 50 F.2d 336.