Burke, J.
(dissenting). “ [I]t is axiomatic that the measure of compensation for property taken is the owner’s loss and not the taker’s gain (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195; Kimball Laundry Co. v. United States, 338 U. S. 1, 5; McGovern v. New York, 229 U. S. 363). In its application to this case, this simply means that we must look to the value of what the condemnees have lost and not to what the condemnor has gained.” (Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212, dissenting opn., p. 224; see, also, St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41.) There was no disagreement on this court in the recent Fifth Ave. case on this point; our only difference concerned the amount of the loss resulting to the condemnee because of that talcing. The fundamental premise upon which our holding there was based, as well as that upon which the dissent was grounded, was that the economic loss of the owner was determinative of the amount of compensation to which it was entitled under the Constitution of this State and the Federal Constitution. The very same rule is articulated by the New Jersey authorities as to the requirements of the Constitution of that State. (See, e.g., Currie v. Waverly & N. Y. Bay R. R. Co., 52 N. J. L. 381 [Ct. Err. & App., 1890]; City of Trenton v. Lenzner, 16 N. J. 465 [1954], cert. den. 348 U. S. 972 [1955]; Yara Eng. Corp. v. Newark, 136 N. J. Eq. 453 [1945].)
*475 Today, however, we are told that the claimant owner of a decrepit, financially hopeless transportation system, tailored to the measurements of an ancient, badly mended tunnel[1] is entitled, by reason of the decision of the public authorities to take over its operations, rehabilitate it at a cost of about 80 million dollars, and assume its losses, to a special dispensation from this basic rule. We are told that, to avoid “ injustice,” the property, since it is to be put by the public authorities to the very same use to which it was formerly devoted, must be valued at its original cost less some amount representing the cost which the public will have to pay to put it in condition to operate safely and efficiently.
In my view ‘‘ justice ’ ’ demands nothing of the sort. There is neither authority nor reason for such an award. It is unreasonable and unfair to the Port Authority, and, therefore, denies this bi-State agency the due process to which it is entitled in our courts, and it may well be in violation of the interstate compact under which the Legislatures of New York and New Jersey provided that the Port of New York Authority should take over and operate this commuter railroad.
It is abundantly clear, I feel, that the majority is troubled by the great disparity between this railroad’s commercial value as scrap and its value, as the majority views it, to the public as an operating, though unprofitable, publicly financed transit facility. The court has not, however, translated this visceral feeling of discontent with the application of traditional rules of valuation to the case at bar into a rational alternative formula for determining just compensation.
The majority is correct in asserting that determination of the just compensation to which one whose property has been taken under the power of eminent domain is entitled is, as the cases reveal, not subject to “ rigid rules ”. Notions of “ fairness ” *476 and “ equity ” under all the circumstances of the case are involved. (United States v. Commodities Corp., 339 U. S. 121, 124, cited in United States v. Virginia Elec. Co., 365 U. S. 624.) “ Fairness ” and “ equity ”, however, are terms with content, albeit often difficult of exact determination. They are not mere alibis upon the basis of which emotion unreined by reason may roam unchecked. The demands of fairness are fully met when, as Mr. Justice Roberts observed in United States v. Miller (317 U. S. 369, 373), the owner of taken property “ is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.” Likewise, “It is not fair that the government be required to pay [an] enhanced price which its demand alone has created.” (United States v. Cors, 337 U. S. 325, 333; italics supplied.) The taker too is entitled to fairness. To compel it to pay an award which ‘ ‘ does not fairly represent the fair market value is effectively a confiscation of public property.” (Matter of City of New York [Friedman], 24 A D 2d 243, 246.)
What, then, we may ask ourselves, have the owners of this railroad lost through its taking! Where would they be, what would their investment be worth, absent this taking! The answer is very simple. Absent this taking, the Hudson Rapid Tubes Corporation would still be the owner of a dismally unprofitable railroad, whose highest commercial value was as scrap. This is not disputed. The opinion for the majority sufficiently describes the road’s bleak history and its barren future.[2] No private purchaser would think of taking it over for purposes of continuing its operations. Commercially, its liquidation value was all the owners could hope to realize. I cannot see how “fairness” and “ justice ” require that the public, here this bi-State agency, its bondholders and the millions of persons it serves, should have to pay the owners any more than this amount *477 for their property. Mr. Justice Cardozo’s comment is perfectly apt: “ Substantial prices are not paid for the privilege of conducting a business at a loss.” (Roberts v. City of New York, 295 U. S. 264, 282.)
The majority, in order to justify an award higher than scrap value, has stressed the fact that these railroad properties are (and presumably need) to be continued in use by the condemning agency and that they would cost hundreds of millions of dollars to reproduce.[3] Such considerations are, however, irrelevant to determination of the question at hand. These properties have, it is clear, value to the taker, only in the sense that they are specially adaptable to a continually diminishing public need, at a huge cost, but it is equally clear that such gain to the taker is wholly unrelated to any deprivation imposed upon the owner and must, for that reason, be rejected as a measure of the public’s obligation to pay. (Kimball Laundry Co. v. United States, 338 U. S. 1, 5.) Value to the taker can be allowed as a basis for an award here only if we are to allow the owner to take advantage of the political necessities of the condemning party. But11 [i]t is just this advantage that a taking by eminent domain excludes.” (McGovern v. City of New York, 229 U. S. 363, 371-372; see, also, United States v. Twin City Power Co., 350 U. S. 222, 228, citing United States v. Miller, supra, p. 375; United States v. Cors, supra.)
Analogous to this present situation was the situation involved in United States v. Twin City Power Co. (supra). There, as here, the property acquired had conceded physical utility for the purposes of the acquisition whether in the hands of the condemnor or the condemnce. The condemnee, a power utility, had previously assembled the lands for the very purpose to which the Government intended to devote the land. The utility began its acquisition in 1901. By 1911, it owned practically all the land necessary for an integrated site for a hydroelectric power *478 project. The Twin City land (4,700 acres) was not only available but essential for such project.
The position taken by the condemnee in Twin City had in many respects a more valid basis in terms of “ justice ” and “ equity ” than that of the present claimant, but there in rejecting the power company’s claim based on the special availability of the lands for the purposes of the Government (i.e., for power-site purposes) the Supreme Court held that it had such value only in the hands of the Government since the latter possessed the dominant servitude in the flow of the stream, without which the land had no value as a power site. Since the owner did not possess the power potential in the stream, it could claim no power potential in the land. By the same token the property in the case at bar has utility only in the hands of the petitioner which has the financial capacity to engage in a deficit operation, whereas it is conceded that no private investors can be found who would undertake such an operation. To paraphrase Twin City, only a governmental entity, such as the petitioner, has possession of the cash flow, "without which the property involved herein has no value for railway purposes. Since neither the claimant nor other private persons possess such cash flow which they would willingly devote to such purpose they can claim no railway value in the property.
The majority’s citation of Denver v. Denver Union Water Co. (246 U. S. 178), a rate making case, as support for the proposition that in a proceeding in eminent domain a commercially valueless enterprise must be valued above scrap, simply because the condemnor has elected to continue the business at a loss, is inapposite. The majority concedes that the remark it quotes was uttered in ‘ ‘ another context ’ ’, and that context bears examination. In Denver v. Denver Union Water Co., the Supreme Court was dealing with a situation wherein the City of Denver attempted to impose upon the utility, by means of an ordinance declaring its right to carry water under the city streets to be merely ‘ ‘ at sufferance ’ ’, rates based upon liquidation or ‘ ‘ junk ’ ’ value of the enterprise. The Supreme Court, however, read this ordinance as failing in achievement of its declared purpose. It found that it could not read the enacting provisions of the ordinance ‘1 as leaving t lie company actually without the right *479 to maintain its plant in the City thereafter ”. “ The alternative, which we adopt,” the court said, “is to construe the ordinance as the grant of a new franchise of indefinite duration, terminable either by the City or by the company at such time and under such circumstances as may be consistent with the duty that both owe to the inhabitants of Denver.” “ In this situation,” the court stated, “there can be no question of the company’s right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use ” (supra, pp. 190-191). On this basis, it was held that the utility’s valuation for rate making purposes had to be higher than scrap.
The Denver case, wherein there was, apparently, no question but that the company would be an economically viable, profitable enterprise, given a reasonable rate, is to be contrasted with the Market Street Railway case, in which, by force of economic circumstances, no matter what the contemplated rate, the transit company would not provide any return on investment. (Market St. Ry. Co. v, Commission, 324 U. 8. 548, 565.) There the Supreme Court indicated that even salvage value could be utilized as the basis for determining the rate to which the company was entitled. (Id., p. 568.)
The majority compounds its error in considering the public’s need for this property with the illogic of utilizing “ original cost ” as a basis upon which, with adjustments, the amount of claimant’s award should be determined. As Mr. Justice Clark pointed out in United States v. Toronto Nav. Co. (338 U. S. 396, 403), “ Original cost is well termed the 1 false standard of the past ’ where, as here, present market value in no way reflects that cost.” The only source even approaching the status of authority that the majority can find to justify an award based on original cost is Matter of City of New York (265 N. Y. 170) where this court held that the city had to pay the condemnee for the original cost of presently valueless easements of light and air it had earlier been required to purchase. The majority takes no note of the comments of Mr. Justice Cabdozo on this aspect of the case when it came before the United States Supreme Court. There he declared: “ Much could be said in support of the position that the value of the so-called easements was nothing *480 more than nominal. * * * We do not go into that question now, for the city and the abutters are not petitioners in this court, and must acquiesce in the award as made. * * * Enough for present purposes that the award is not too low, though perhaps it is too high.” (Roberts v. City of New York, supra, p. 282.) The comment of Mr. Justice Cardozo later in his opinion in Roberts to the effect that the value placed upon the physical assets of the Manhattan Railway Company as scrap might be too low were it not for the award made for the easements in no way supports the proposition that the owners of that railway were entitled under the Constitution to compensation for their taking. It seems clear that Mr. Justice Cardozo at that point in his opinion had reference only to the determination of scrap value made by the courts below and there was pointing out that any complaint the condemnees might have with respect to this determination was more than sufficiently cured by the award for the easements of light and air. The action of this court in sustaining an award for the taking of these easements which were no longer of any value to the condemnees may most generously be characterized as the product of a momentary lapse, perhaps in part occasioned by a too harsh determination of the road’s scrap value, and this I think our former Chief Judge fully realized. The case lends little support to the action of today’s majority. (Even Special Term recognized this, distinguishing the case on the basis that there the property was condemned for destruction, a clearly invalid basis for distinction.)
Over and above what the majority proposes to award claimant for its tangible properties, it further proposes to allow an award for ‘ ‘ going concern ’ ’ value, the amount of which is to be determined upon remand. In contrast to the Fifth Avenue Coach Lines, whose lack of earnings was due to the action of the city in denying it a reasonable rate at which it could make a profit (witness the City of New York’s highly profitable operation of these bus lines since the higher fare was inaugurated), this enterprise is “inherently incapable of profitable operation”. (Matter of City of New York [Fifth Ave. Coach Lines], supra, p. 220.) Economic viability, i.e., the capacity to operate at a profit, is, as the Fifth Ave. opinion makes clear, the sine qua non *481 for an award of going concern value. (Ibid.)[4] This prerequisite condition has not been met here.[5]
The court in reaching today’s decision pays lip service to the mandate it is under to determine the award for the New Jersey properties here in question under the requirements of the New Jersey and Federal Constitutions, but it is not an open question what the New Jersey and Federal authorities hold. They expressly reject the notion that special or unique value to the taker alone, the basis upon which the majority’s suggested award is founded, may be considered in determining just compensation.
In what is perhaps the leading New Jersey case on this point the Court of Errors and Appeals, speaking in terms so unambiguous that one would not think its view could be disregarded by this court, declared, “ Neither the individual advantages to the party acquiring the land, nor the necessity of its acquisition, can be considered in computing the [owner’s] loss ”. (Currie v. Waverly & N. Y. Bay R. R. Co., supra, pp. 395-396.) The court there held that the property owner was improperly barred by the court below from introducing evidence as to the special value of his land to other potential purchasers than the condemnor, and thus reversal was called for (citing, among other cases, Boom Co. v. Patterson, 98 U. S. 403), but its statement of the rule applic *482 able to the instant case leaves nothing to be desired in the way of clarity.
The very same rule was enunciated in Yara Eng. Corp. v. Newark (supra, p. 464), where the Court of Chancery of New Jersey said: “ The value [for compensation purposes] to be found is market value, what a willing buyer would pay in cash to a willing seller. In reaching the market value, consideration must be given to all uses to which the land may be put, and the owner be given the benefit of the best and most valuable use. But the special value of the land to the [condemnor], as distinguished from others who may or may not have power to condemn, must be excluded.”
In City of Trenton v. Lenzner (supra, p. 476) the Supreme Court of New Jersey reiterated the rule long adopted by the courts of that State, “ The measure of compensation is the fair market value ”, and cited repeatedly and with obvious approval Kimball Laundry Co. v. United States (supra), wherein, it must be recalled, Mr. Justice Frankfurter very clearly pointed out that where gain to the taker is unrelated to any deprivation imposed upon the owner it must be rejected as a measure of the public’s obligation under the Constitution to provide just compensation. (See 338 U. S. 1, 5, cited at 16 N. J. 465, 476-477.) Later in its opinion the court pointed out that a “foremost factor ” in determining fair market value of a taken business ‘ ‘ would be its prospective earning power evidenced in considerable part by past earnings. ’ ’ (16 N, J., p. 479.) Just compare this approach with that adopted by today’s majority in this court.
Just recently the Appellate Division of the Superior Court of New Jersey, citing Currie and Yara Engineering, had occasion to remark that “ Certainly, the State’s purposes in acquiring [condemned] property would not be a proper consideration in fixing its value.” (State of New Jersey v. Wemrock Orchards, 95 N. J. Super. 25.)
The majority, however, by the device of characterizing the instant case as sui generis, presumes to reject the New Jersey authorities and, rather, imposes its new and radical theory of what “ justice ” requires upon a situation in which the courts of New York have been authorized only to apply New Jersey and Federal constitutional law, not to create new and revolu *483 tionary law. The majority, by implication at least, recognizes that its proposed award is not required by the Federal Constitution (rather, it acknowledges that it must decide this portion of the case as if it were a New Jersey court), and, therefore, its disregard of the New Jersey authorities is in my view tantamount to a violation of the interstate compact authorizing this condemnation and conferring jurisdiction upon this court.
Even further, it can reasonably be argued that the condemnor, this bi-State agency, the creature of the States of New York and New Jersey, whose interests, however, are not necessarily coterminous with the interests of either State, has a right under the interstate compact to have applied even to determination of just compensation for the New York property here in question the law as it existed under settled principles heretofore followed in this State, not as it has just been so drastically changed. An interstate compact is analogous in many respects to a contract (see Dyer v. Sims, 341 U. S. 22, 28-29) and the bi-State legislation constituting this compact, providing that the owner of the property thus taken should “ not be awarded for such property any increment above the just compensation required by the constitutions of the United States and of the state or states in which the property is located or has its situs by reason of any circumsanees whatsoever ” (N. Y. L. 1962, ch. 209, § 14; N. J. L. 1962, ch. 8, § 14), may, especially since the requirements of all three Constitutions were formerly regarded as virtually identical, reasonably be read as incorporating the well-settled rules of law applicable to this case and as barring the sort of judicial amendment of our State’s Constitution indulged in here today. The State of New Jersey, which has appeared herein by its Attorney General as amicus curiae, and the Port Authority, it would seem, have rights under this compact which must take precedence over our judicial solicitude for those financial interests, whoever they may be and wherever they may be located, that have seized upon this railroad as an object for speculation. Determination of these rights presents an important question of Federal law (see Delaware Riv. Comm. v. Colburn, 310 U. S. 419) to which the majority has not even alluded.
I would modify the Appellate Division’s award only to the extent of reducing the award by $500,000, an amount representing cash assets of the Hudson Rapid Tubes Corporation not *484 taken in this proceeding, hut mistakenly assumed by the Appellate Division to have been taken, and by allowing 6% interest on the New Jersey portion of the award. Other than this, I would affirm its decision based on the law and the facts.
Chief Judge Fuld and Judges Van Voorhis, Scileppi and Bergan concur with Judge Keating ; Judge Burke dissents as to the decision on the appeal by claimant Hudson Rapid Tubes Corporation and votes to modify in a separate opinion; Judge Breitel taking no part.
On appeal by claimant Hudson Rapid Tubes Corporation, order of Appellate Division modified, with costs in this court and in the Appellate Division, in accordance with the opinion herein and, as so modified, affirmed, and matter remanded to Special Term for further proceedings in accordance with the opinion herein.
On appeal by claimant Hudson and Manhattan Corporation, order of Appellate Division affirmed, without costs.
In view of the disposition herein, cross appeal of the Port Authority Trans-Hudson Corporation dismissed as academic.

. In the course of its construction, the original tunnel “blew out” and was flooded, requiring the installation of a reinforced concrete lining which reduced the bore of the tunnel to 15 feet, 3 inches. This set the standard for the balance of the system, requiring utilization of cars of a size unsuitable to a modem transit system. Additionally, the line has sharp curves and steep grades necessitating reduced operating speeds for its trains. In 1910 the chief engineer for the road told the Institute of Civil Engineers of Great Britain that the road had been planned with single unit trolleys in mind, not multiple unit trains.

. For instance, in the face of a 50% increase in the population of Northern New Jersey between 1930 and 1960, this railroad’s traffic declined 70%. From the date of this taking, 1962, to 1964, it declined 10%. Its operating losses were staggering, and, if it were not taken over when it was, continued operation would have served only to lessen (probably eliminate) the value of the owners’ equity in the enterprise. This decline continued into 1965 (an additional 6%).

. The majority recognizes, as did the six Justices below, that these allegedly essential facilities (whose absolute essentiality is open to considerable doubt in light of the severe and continuing passenger decline) would not be reproduced exactly. The “substitute facility” might well be additional automotive tubes and buses, all of which have proven profitable.

. In footnote 4 of its opinion the majority attempts to seize upon a remark I made in my Fifth Ave. opinion with respect to “dwindling profits”. It fails to note that “ dwindling profits ” still means profits. The entire thrust of the Fifth Ave. opinion was that the bus company was capable of profitable operation, given a reasonable rate.

. Additionally, even the grossest comparison between the Fifth Avenue Coach Lines and the Hudson Tubes operations makes clear the lack of any constitutional requirement for an award of going concern value. The claimant in Fifth Ave. had organized and systematized an enterprise carrying each working day of the year about 1,250,000 passengers. This service was complementary to, not competitive with, the already overcrowded subway facilities in New York City. With a fare increase the enterprise became highly profitable. The Hudson Tubes, on the other hand, have in recent years experienced a continual decline in the number of passengers served. These passengers have been lost to other modes of transportation, especially buses and automobiles. It is conceded that with a fare increase so many passengers would be lost by this railroad that it would be in worse straits. Any value that this railroad once had, or might have had, as a going concern has been lost by the operation of economic forces. (Cf. statement by the dissent in Matter of City of New York [Fifth Ave. Coach Lines], supra, p. 229.) At its taking this was a technologically and functionally obsolescent railroad system.