20 N.Y.2d 457 (1967)
In the Matter of the Port Authority Trans-Hudson Corporation, Respondent-Appellant, Relative to Acquiring Real Property in the State of New York and the State of New Jersey for Hudson Tubes Purposes. Hudson Rapid Tubes Corporation et al., Appellants-Respondents.
Court of Appeals of the State of New York.
Argued April 3, 1967.
Decided October 31, 1967.
David W. Peck, Theodore N. Tarlau, L. Robert Driver, Jr., John C. Jaqua, Jr., and Michael A. Cooper for appellants-respondents.
Whitney North Seymour, Joseph Lesser, Milton H. Pachter, Robert S. Tobin, John A. Guzzetta, James J. Hagan, Eleanor M. Fox and Nancy M. Clarkson for respondent-appellant.
Louis J. Lefkowitz, Attorney-General of New York (Julius L. Sackman and Ruth Kessler Toch of counsel), for State of New York, amicus curiæ.
Arthur J. Sills, Attorney General of New Jersey (David A. Biederman, admitted on motion pro hac vice, and Alan B. Handler of counsel), for State of New Jersey, amicus curiæ.
Chief Judge FULD and Judges VAN VOORHIS, SCILEPPI and BERGAN concur with Judge KEATING; Judge BURKE dissents as to the decision on the appeal by claimant Hudson Rapid Tubes Corporation and votes to modify in a separate opinion; Judge BREITEL taking no part.
*464 KEATING, J.
The Hudson Rapid Tubes Corporation and the Hudson and Manhattan Corporation were the owners and operators of an interurban electric railroad system commonly known as the Hudson Tubes. The facility which has been in operation since 1911 carries some 28,000,000 passengers yearly and over 24% of the daily rush hour commuters between New York City and its New Jersey suburbs.
The Tubes have not, however, achieved the financial success which these figures might indicate. From its inception the Tubes encountered financial difficulty which continually plagued its operation. These difficulties, though initially due to the poor financial structure of the corporation as well as inefficient management, were compounded in recent years by a tremendous decline in the number of commuters as well as increasing labor costs.
The construction of bridges and tunnels opened the gates of New York City to millions of automobile and bus commuters who would otherwise use the Tubes. In addition, improved labor conditions since the 1930's served not only to increase the cost of operating the facility but also contributed to the passenger decline by reducing the work week from 6 to 5 days. All these factors combined accounted for a decline in passengers from 113,142,000 in 1927 to 28,000,000 in 1964.
Moreover, the ready availability of alternative forms of transportation via the tunnels and bridges limited the effectiveness of fare increases in coping with the desperate financial situation brought about by the loss in passenger service and increased labor and maintenance costs.
The situation was such that the corporation which had operated the Tubes was forced into reorganization under the Bankruptcy Act. In this reorganization, completed in 1961, all the shareholder interests, both common and preferred, were wiped out; unsecured creditors were paid in cash at the rate of 10 cents on the dollar and the railroad operation was severed from the building structures in order to prevent the deficits of the former from causing the financial demise of the latter. Under the plan, the building properties were placed in a new *465 entity, the Hudson and Manhattan Corporation, while the railroad operations were to be conducted by a wholly owned subsidiary, the Hudson Rapid Tubes Corporation. The latter was provided with approximately $500,000 in cash, an amount woefully inadequate to meet the long-neglected maintenance needs of the corporation.
Yet, despite its poor financial condition, the Tubes remained an essential public facility, without which the remaining interstate facilities were incapable of transporting the thousands of persons who commuted daily between New York City and New Jersey.
Given the essentiality of this facility and, faced not only with the bleak past but with the dim financial future of the Tubes, the Legislatures of both the States of New York and New Jersey determined that the continued operation of the facility could only be continued under public ownership. Therefore, pursuant to bi-State legislation (L. 1962, ch. 209; N. J. L. 1962, ch. 8), the petitioner, Port Authority Trans-Hudson Corporation (PATH), a wholly owned subsidiary of the Port of New York Authority, condemned the property of both the Hudson and Manhattan Corporation and the Hudson Rapid Tubes Corporation.
The Supreme Court (Special Term) made an award of $55,000,000 to the Hudson Rapid Tubes Corporation for its railway property and an award of $17,996,000 to the Hudson and Manhattan Corporation for its buildings. Interest on the Hudson Rapid Tubes award was granted at the rate of 4% per annum on that portion of the property situated in New York State and at the rate of 6% on the physical assets situated in New Jersey. By stipulation, the railway properties were allocated 65% to New Jersey and 35% to New York. Interest on the award to the Hudson and Manhattan Corporation for its real property was also limited to 4%.
The Appellate Division, two Justices dissenting, modified the award to Hudson Rapid Tubes from $55,000,000 to $3,500,000. The basis of the Appellate Division's ruling was that, because of the poor financial condition of the corporation, there would be no prospective commercial purchasers available on the open market and, therefore, under traditional rules, the only value which the property had to its owners was liquidation or *466 scrap value. The Appellate Division also reduced the rate of interest on the properties situated in New Jersey from 6% to 4%.
The claimant-appellant, Hudson Rapid Tubes Corporation, appeals from the Appellate Division order, alleging that the court erred in predicating its award on salvage or scrap value. It asks us to increase the award to $127,000,000. In addition, it asks reinstatement of Special Term's interest award of 6% on the New Jersey property and, along with its parent, Hudson and Manhattan Corporation, it asks us to strike down as unconstitutional New York's statutory award of 4% interest as it applies to the New York property for the period after January 1, 1966.[1]
The condemnor, Port Authority Trans-Hudson Corporation, also appeals from so much of the order of the Appellate Division as included in its award $500,000 cash which was not appropriated.
The first and most important issue which must be decided on this appeal is the question of what constitutes just compensation to the owner and operator of an essential public facility when its property is condemned for continued dedication to the same use to which the owner had dedicated the property. It is essential to the resolution of this question to consider first what was actually taken. Special Term divided the property into two classes, the tunnel property and the non-tunnel property.
The tunnel property upon which it placed an evaluation of $30,000,000 included:
(a) Four single-track railway tunnels under the Hudson River, two 6,600 feet long and the other two 6,000 in length  making a total of 25,200 feet, or about 4¾ miles of subaqueous tunnels.
(b) Subterranean tunnels or subways, which connect the river tunnels to the railway's terminals  at Church Street and at 33rd Street in Manhattan and at Hoboken and Jersey City  including nine stations which are integral parts of these subway tunnels. The entire railway system measures, as double track, 7.9 miles in length, of which the subterranean tunnels or subways are about 5.4 miles in length.
*467 For this property, which would cost in excess of $400,000,000 to reproduce and would require an expenditure of only $88,000 to put in perfect working order, the Appellate Division awarded virtually nothing, since the property would in liquidation bring at most a nominal sum, if that.[2]
The non-tunnel property, for which Special Term awarded $20,000,000 plus an additional increment of $5,000,000 for going concern value, included:
(a) Generally speaking, all the non-tunnel properties, including 223 passenger cars;
(b) the signal system, track and roadbed;
(c) electrical transmission, distribution system, communication system and compressed air system;
(d) structures, including repair shops, electrical substations and surface passenger stations;
(e) emergency fans and blowers, tunnel drainage and sewage ejection systems; and
(f) shop equipment, tools, change booths, turnstiles, etc.
For this non-tunnel property, the Appellate Division awarded approximately $3,000,000. Of this, $1,700,000 covered the cost of recently purchased railroad cars and $1,300,000 the remainder. The Appellate Division also held that, because of the unprofitability of the business enterprise, no separate award for going concern value was justified.
We hold that the Appellate Division erred in its disposition, that its decision, particularly as it relates to the tunnel property, reaches a harsh and unjust result and is neither compelled nor warranted by precedent.
The Appellate Division correctly observed that the traditional rule which has evolved in condemnation cases is that just compensation requires that the property owner be awarded in cash an amount equivalent to the value which the property had in his hands  i.e., the sum of money which he could have realized in an uncoerced sale in the open market to a willing buyer. More precisely stated, the rule is that just compensation requires only that the condemnee be paid for what he has lost and not for what the taker has gained.
*468 A problem like this, however, cannot be dealt with dogmatically. One commentator has described "value to the taker" as being "One of the most confusing aspects of the theory of valuation under the law of eminent domain" (1 Orgel, Valuation Under Eminent Domain [2d ed., 1953], p. 351). The decisions are not always helpful. The oft-cited opinions of Mr. Justice HOLMES in City of New York v. Sage (239 U. S. 57) and McGovern v. City of New York (229 U. S. 363) both dealt with the claim of a farmer whose property was taken, along with many other parcels, to establish a reservoir site. The court correctly rejected the owner's claim that he be compensated on the basis of reservoir values, since the reservoir was created by the assemblage made possible solely by the condemnation itself.
The present case is in sharp contrast. We are here concerned with a property which has a usefulness created by the owner himself through the expenditure of large sums of money and by the continued operation of the property for the very purpose for which the petitioner is acquiring the property. It is the owner who built the "reservoir"  the Tube railway system in the present case. This owner has developed its property at a cost of millions of dollars and operated it for more than 50 years. It is admittedly of great usefulness in the daily transportation of thousands of commuters. A condemnor should not be permitted to tell him: "It's only worth scrap or less".
While the rule which was applied by the Appellate Division is one of general acceptance (1 Orgel, Valuation Under Eminent Domain, supra, p. 353) and achieves a reasonable and just result in most cases, neither this court nor the Supreme Court of the United States has ever attempted "to prescribe a rigid rule for determining what is `just compensation' under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when the market value has been too difficult to find, or when its application would result in manifest injustice to the owner or public, courts have fashioned and applied other standards." (United States v. Commodities Corp., 339 U. S. 121, 123 [emphasis added]; United States v. Virginia Elec. Co., 365 U. S. 624.)
Thus, in Matter of City of New York (265 N.Y. 170), involving the condemnation of an elevated railroad spur for the purpose *469 of destruction, we sustained an award for the easements of light and air for which the condemnee was required to pay when it constructed the elevated railroad. Although the railroad facility in question was losing money and the easements had no value to the railroad upon the cessation of operations, we upheld an award predicated upon original cost. Chief Judge POUND, speaking for the court, wrote (p. 181): "The contention of the city, that the railroads are entitled to no compensation, is based on the argument that these rights were of no use to the railroads except as they were compelled to acquire them to operate and of no value except to a going concern, has some logical force, but such rights were obtained in order to permit the roads to exercise their franchise in the street in perpetuity, and when the city terminated such rights it should fairly compensate the roads for the loss of such rights."
It is true that we sustained in that case an award of scrap value for the actual structures. Unlike the case at bar, however, the structures were useless and were being condemned for destruction. Likewise, no award was allowed for the franchise which the corporation received without cost from the State, albeit they were required to expend large sums of money to acquire the easements. The court quite properly felt that the reimbursement for the cost of these easements was sufficient under the circumstances.
We note that the Supreme Court in affirming our decision as to the value of the structure wrote: "The structure was appraised as junk, the city having undertaken to bear the cost of removal. Such an appraisal might be too low were it not for the award for the private easements. To realize the value of those easements, an abandonment of the spur was necessary. `The railroads could not release their rights to the abutting owners and continue to operate their railroads in the street.' * * * The structure in the circumstances had no value except as scrap." (Roberts v. City of New York, 295 U. S. 264, 284, per CARDOZO, J. [emphasis added].)
Most recently in Matter of City of New York (Fifth Ave. Coach Lines) (18 N Y 2d 212, 225) we likewise departed from the general rule where to do otherwise would have, in the words of the Supreme Court, resulted in "manifest injustice to the *470 owner" of the property. In that case both lower courts and this court awarded amounts far in excess of what could have been realized on the open market because of the financial condition of the condemnee. We felt it would not conform to traditional standards of equity and justice to permit the city to break the company financially and then pick up the pieces at a highly depreciated rate.[3]
We are well aware of the distinction between this case and cases we have just cited and discussed. Nevertheless, the common thread which runs through all of them is that just compensation requires a result which is "`just' both to an owner whose property is taken and to the public that must pay the bill". (United States v. Commodities Corp., 339 U. S. 121, 123, supra.)
Can it be said by any objective standard that an award of scrap value  nothing  is fair and just for the tunnel property, an essential part of an essential public facility, which cost some $32,000,000 to construct, which would cost in excess of $400,000,000 to reproduce and which, with some minor expenditures, will function as good as new for an indefinite period? We think not. As the Supreme Court noted in another context: "It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its `junk value.'" (Denver v. Denver Union Water Co., 246 U. S. 178, 191 [1918].)
On the other hand, we cannot ignore the factors which militate against a recovery of the kind suggested by the condemnee. We cannot ignore the unprofitability of the corporation. That is a very significant factor. We cannot ignore the reasons for this unprofitability. Nor can we ignore the fact that, while these tunnels are adequate to meet the needs of the condemnor for an indefinite period of time, their construction and design left something to be desired 50 years ago and that, if a new facility were being constructed, it would be structured in such a manner as to insure adaptability to the modern means of *471 transportation which are likely to be developed as we progress into the 21st century.
Considering all these factors, we believe that the award of $30,000,000 made by Special Term and predicated on the conclusion that the condemnees should at least be repaid for the depreciated original cost of the tunnels is fair and just and that an award either considerably above or below that figure would be "manifestly unjust" to the owner whose property is taken and the people who must pay the bill.
As to the non-tunnel property we believe, for the same reasons outlined above, that the Appellate Division erred in awarding scrap value solely on the basis of unprofitability of the enterprise. On the other hand, the award of $20,000,000, allowed by Special Term, on the basis of original cost less an amount for depreciation which had no support in the record, is arbitrary and cannot be sustained.
The record reveals that much of the non-tunnel property was severely deteriorated, and that an expenditure of almost $32,000,000 would be necessary to rehabilitate the non-tunnel property whereas only $88,000 was all that would be required to restore the tunnels. In addition, the record indicates that, despite rising costs of labor and equipment, the original cost of the non-tunnel property exceeded the depreciated reproduction cost of that property and the award made by Special Term was only some $3,000,000 less than the depreciated reproduction cost. By comparison, the award for the tunnel property, which gave effect to the unprofitability factor, was less than one fifteenth the depreciated reproduction cost. It is thus clear that Special Term not only failed to give effect to the physical and technological obsolescence of the property but that it also apparently ignored the enormous expenditure which was required to rehabilitate the property and did not give any significant effect to the unprofitability factor.
We believe that this portion of the case must be remanded to Special Term for a determination of just compensation based upon all the factors which we have outlined.
Similarly, we believe that Special Term erred in awarding $5,000,000 for going concern value by taking 10% of the total award for tangible property. While there is evidence that such *472 a value exists in this case, there is no proof in the record to sustain Special Term's finding that the claimant is entitled to an award of an additional 10% of the values fixed for the tunnel and non-tunnel properties. There is no basis or warrant in law for any such rule of thumb. A finding of going concern value must be based upon evidence paralleling what we held would have to be shown in the Fifth Ave. Coach case (18 N Y 2d 212, 221-222, supra), that is, the cost of organizing and systematizing the enterprise, such as the cost of developing operating schedules, operating records, systems of procedure and the training of personnel.[4] To the extent that unprofitability is evidence of inefficient organization that factor must be considered in determining the award.
Before going on to discuss the remaining points, a brief discussion of New Jersey law is appropriate. Under the bi-State legislation authorizing the condemnation of property by the Port of New York Authority (L. 1961, ch. 312, § 14; N. J. Stat. Ann., § 32:1-35.63) we are required to apply New Jersey law to that portion of the property located in New Jersey. The New Jersey law in this area is similar to the general rule which prevails in this and the Federal jurisdiction. (Currie v. Waverly & N. Y. Bay R. R. Co., 52 N. J. L. 381, 395; City of Trenton v. Lenzner, 16 N. J. 465, 478, cert. den. 348 U. S. 972.) For the reasons we have outlined, we regard this case as sui generis and one which requires an approach different from that generally followed. Indeed, the few cases in other jurisdictions which are similar to the one at bar have also departed from the general rule (see 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 217).
We of course cannot state with certainty what approach our *473 brethren on the New Jersey Supreme Court would take to this problem. Perhaps they would award less  perhaps more. We must, however, decide the case and we believe that, because of the manifest injustice of awarding scrap value, it is not unreasonable to assume that the view we have taken would be adopted by that court.
We turn now to the award of interest. The contention made by both condemnees regarding the unconstitutionality of the New York statute limiting the award of interest to 4% was made and rejected in Matter of City of New York (Fifth Ave. Coach Lines) (supra, cert. den. on this particular issue 386 U. S. 778). No substantial reason has been suggested requiring a different result in the case at bar.
We agree, however, with the Hudson Rapid Tubes' contention that the Appellate Division erred in reducing the interest award on the New Jersey property from 6% to 4%. The argument advanced by the condemnor is that New Jersey has no statute regarding the payment of a specific rate and that the New Jersey courts, in considering the rate of interest to be awarded, would give some weight to the fact that the condemnee's enterprise was operating at a loss and would, therefore, award only 4% interest instead of the usual 6%. This argument, however, overlooks the fact that the condemnee is entitled to the principal award for the taking of its property from date of the taking and that the award of interest compensates for the failure to make such payment. It is most inequitable and, indeed, unconstitutional, we believe, to penalize the condemnee for the delay which has resulted in the most part from the litigation which it has engaged in to protect its own rights. Moreover, the unprofitability aspect has already been taken into consideration in determining the initial award. To consider that fact again in determining the rate of interest is unfair and is not permitted or sanctioned either by the Constitution of the United States or New Jersey law. (United States v. Klamath Indians, 304 U. S. 119, 123; State v. Seaway, 46 N. J. 376, 380.)
The award of 6% is fair and proper under New Jersey law (Cohrs v. Igoe Bros., 71 N. J. Super. 435, 448) and the Appellate Division's determination in this regard should be rejected and Special Term's accepted.
*474 To summarize:
On appeal by the claimant Hudson Rapid Tubes Corporation, the order of the Appellate Division should be modified, with costs in this court and in the Appellate Division to the claimant, to the extent of (1) reinstating so much of the decree of Special Term as awarded $30,000,000 for the subway and tunnel properties and as fixed the rate of interest applicable to the award for the New Jersey properties, and (2) remanding to Special Term for further consideration, in accordance with the opinion herein, questions relating to the determination of value for the remaining properties and going concern value and, as so modified, affirmed.
On the appeal by the claimant Hudson and Manhattan Corporation, the order of the Appellate Division should be affirmed, without costs.
BURKE, J. (dissenting).
"[I]t is axiomatic that the measure of compensation for property taken is the owner's loss and not the taker's gain (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195; Kimball Laundry Co. v. United States, 338 U. S. 1, 5; McGovern v. New York, 229 U. S. 363). In its application to this case, this simply means that we must look to the value of what the condemnees have lost and not to what the condemnor has gained." (Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212, dissenting opn., p. 224; see, also, St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41.) There was no disagreement on this court in the recent Fifth Ave. case on this point; our only difference concerned the amount of the loss resulting to the condemnee because of that taking. The fundamental premise upon which our holding there was based, as well as that upon which the dissent was grounded, was that the economic loss of the owner was determinative of the amount of compensation to which it was entitled under the Constitution of this State and the Federal Constitution. The very same rule is articulated by the New Jersey authorities as to the requirements of the Constitution of that State. (See, e.g., Currie v. Waverly & N. Y. Bay R. R. Co., 52 N. J. L. 381 [Ct. Err. & App., 1890]; City of Trenton v. Lenzner, 16 N. J. 465 [1954], cert. den. 348 U. S. 972 [1955]; Yara Eng. Corp. v. Newark, 136 N. J. Eq. 453 [1945].)
*475 Today, however, we are told that the claimant owner of a decrepit, financially hopeless transportation system, tailored to the measurements of an ancient, badly mended tunnel[1] is entitled, by reason of the decision of the public authorities to take over its operations, rehabilitate it at a cost of about 80 million dollars, and assume its losses, to a special dispensation from this basic rule. We are told that, to avoid "injustice," the property, since it is to be put by the public authorities to the very same use to which it was formerly devoted, must be valued at its original cost less some amount representing the cost which the public will have to pay to put it in condition to operate safely and efficiently.
In my view "justice" demands nothing of the sort. There is neither authority nor reason for such an award. It is unreasonable and unfair to the Port Authority, and, therefore, denies this bi-State agency the due process to which it is entitled in our courts, and it may well be in violation of the interstate compact under which the Legislatures of New York and New Jersey provided that the Port of New York Authority should take over and operate this commuter railroad.
It is abundantly clear, I feel, that the majority is troubled by the great disparity between this railroad's commercial value as scrap and its value, as the majority views it, to the public as an operating, though unprofitable, publicly financed transit facility. The court has not, however, translated this visceral feeling of discontent with the application of traditional rules of valuation to the case at bar into a rational alternative formula for determining just compensation.
The majority is correct in asserting that determination of the just compensation to which one whose property has been taken under the power of eminent domain is entitled is, as the cases reveal, not subject to "rigid rules". Notions of "fairness" *476 and "equity" under all the circumstances of the case are involved. (United States v. Commodities Corp., 339 U. S. 121, 124, cited in United States v. Virginia Elec. Co., 365 U. S. 624.) "Fairness" and "equity", however, are terms with content, albeit often difficult of exact determination. They are not mere alibis upon the basis of which emotion unreined by reason may roam unchecked. The demands of fairness are fully met when, as Mr. Justice ROBERTS observed in United States v. Miller (317 U. S. 369, 373), the owner of taken property "is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." Likewise, "It is not fair that the government be required to pay [an] enhanced price which its demand alone has created." (United States v. Cors, 337 U. S. 325, 333; italics supplied.) The taker too is entitled to fairness. To compel it to pay an award which "does not fairly represent the fair market value is effectively a confiscation of public property." (Matter of City of New York [Friedman], 24 A D 2d 243, 246.)
What, then, we may ask ourselves, have the owners of this railroad lost through its taking? Where would they be, what would their investment be worth, absent this taking? The answer is very simple. Absent this taking, the Hudson Rapid Tubes Corporation would still be the owner of a dismally unprofitable railroad, whose highest commercial value was as scrap. This is not disputed. The opinion for the majority sufficiently describes the road's bleak history and its barren future.[2] No private purchaser would think of taking it over for purposes of continuing its operations. Commercially, its liquidation value was all the owners could hope to realize. I cannot see how "fairness" and "justice" require that the public, here this bi-State agency, its bondholders and the millions of persons it serves, should have to pay the owners any more than this amount *477 for their property. Mr. Justice CARDOZO's comment is perfectly apt: "Substantial prices are not paid for the privilege of conducting a business at a loss." (Roberts v. City of New York, 295 U. S. 264, 282.)
The majority, in order to justify an award higher than scrap value, has stressed the fact that these railroad properties are (and presumably need) to be continued in use by the condemning agency and that they would cost hundreds of millions of dollars to reproduce.[3] Such considerations are, however, irrelevant to determination of the question at hand. These properties have, it is clear, value to the taker, only in the sense that they are specially adaptable to a continually diminishing public need, at a huge cost, but it is equally clear that such gain to the taker is wholly unrelated to any deprivation imposed upon the owner and must, for that reason, be rejected as a measure of the public's obligation to pay. (Kimball Laundry Co. v. United States, 338 U. S. 1, 5.) Value to the taker can be allowed as a basis for an award here only if we are to allow the owner to take advantage of the political necessities of the condemning party. But "[i]t is just this advantage that a taking by eminent domain excludes." (McGovern v. City of New York, 229 U. S. 363, 371-372; see, also, United States v. Twin City Power Co., 350 U. S. 222, 228, citing United States v. Miller, supra, p. 375; United States v. Cors, supra.)
Analogous to this present situation was the situation involved in United States v. Twin City Power Co. (supra). There, as here, the property acquired had conceded physical utility for the purposes of the acquisition whether in the hands of the condemnor or the condemnee. The condemnee, a power utility, had previously assembled the lands for the very purpose to which the Government intended to devote the land. The utility began its acquisition in 1901. By 1911, it owned practically all the land necessary for an integrated site for a hydroelectric power *478 project. The Twin City land (4,700 acres) was not only available but essential for such project.
The position taken by the condemnee in Twin City had in many respects a more valid basis in terms of "justice" and "equity" than that of the present claimant, but there in rejecting the power company's claim based on the special availability of the lands for the purposes of the Government (i.e., for power-site purposes) the Supreme Court held that it had such value only in the hands of the Government since the latter possessed the dominant servitude in the flow of the stream, without which the land had no value as a power site. Since the owner did not possess the power potential in the stream, it could claim no power potential in the land. By the same token the property in the case at bar has utility only in the hands of the petitioner which has the financial capacity to engage in a deficit operation, whereas it is conceded that no private investors can be found who would undertake such an operation. To paraphrase Twin City, only a governmental entity, such as the petitioner, has possession of the cash flow, without which the property involved herein has no value for railway purposes. Since neither the claimant nor other private persons possess such cash flow which they would willingly devote to such purpose they can claim no railway value in the property.
The majority's citation of Denver v. Denver Union Water Co. (246 U. S. 178), a rate making case, as support for the proposition that in a proceeding in eminent domain a commercially valueless enterprise must be valued above scrap, simply because the condemnor has elected to continue the business at a loss, is inapposite. The majority concedes that the remark it quotes was uttered in "another context", and that context bears examination. In Denver v. Denver Union Water Co., the Supreme Court was dealing with a situation wherein the City of Denver attempted to impose upon the utility, by means of an ordinance declaring its right to carry water under the city streets to be merely "at sufferance", rates based upon liquidation or "junk" value of the enterprise. The Supreme Court, however, read this ordinance as failing in achievement of its declared purpose. It found that it could not read the enacting provisions of the ordinance "as leaving the company actually without the right *479 to maintain its plant in the City thereafter". "The alternative, which we adopt," the court said, "is to construe the ordinance as the grant of a new franchise of indefinite duration, terminable either by the City or by the company at such time and under such circumstances as may be consistent with the duty that both owe to the inhabitants of Denver." "In this situation," the court stated, "there can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use" (supra, pp. 190-191). On this basis, it was held that the utility's valuation for rate making purposes had to be higher than scrap.
The Denver case, wherein there was, apparently, no question but that the company would be an economically viable, profitable enterprise, given a reasonable rate, is to be contrasted with the Market Street Railway case, in which, by force of economic circumstances, no matter what the contemplated rate, the transit company would not provide any return on investment. (Market St. Ry. Co. v. Commission, 324 U. S. 548, 565.) There the Supreme Court indicated that even salvage value could be utilized as the basis for determining the rate to which the company was entitled. (Id., p. 568.)
The majority compounds its error in considering the public's need for this property with the illogic of utilizing "original cost" as a basis upon which, with adjustments, the amount of claimant's award should be determined. As Mr. Justice CLARK pointed out in United States v. Toronto Nav. Co. (338 U. S. 396, 403), "Original cost is well termed the `false standard of the past' where, as here, present market value in no way reflects that cost." The only source even approaching the status of authority that the majority can find to justify an award based on original cost is Matter of City of New York (265 N.Y. 170) where this court held that the city had to pay the condemnee for the original cost of presently valueless easements of light and air it had earlier been required to purchase. The majority takes no note of the comments of Mr. Justice CARDOZO on this aspect of the case when it came before the United States Supreme Court. There he declared: "Much could be said in support of the position that the value of the so-called easements was nothing *480 more than nominal. * * * We do not go into that question now, for the city and the abutters are not petitioners in this court, and must acquiesce in the award as made. * * * Enough for present purposes that the award is not too low, though perhaps it is too high." (Roberts v. City of New York, supra, p. 282.) The comment of Mr. Justice CARDOZO later in his opinion in Roberts to the effect that the value placed upon the physical assets of the Manhattan Railway Company as scrap might be too low were it not for the award made for the easements in no way supports the proposition that the owners of that railway were entitled under the Constitution to compensation for their taking. It seems clear that Mr. Justice CARDOZO at that point in his opinion had reference only to the determination of scrap value made by the courts below and there was pointing out that any complaint the condemnees might have with respect to this determination was more than sufficiently cured by the award for the easements of light and air. The action of this court in sustaining an award for the taking of these easements which were no longer of any value to the condemnees may most generously be characterized as the product of a momentary lapse, perhaps in part occasioned by a too harsh determination of the road's scrap value, and this I think our former Chief Judge fully realized. The case lends little support to the action of today's majority. (Even Special Term recognized this, distinguishing the case on the basis that there the property was condemned for destruction, a clearly invalid basis for distinction.)
Over and above what the majority proposes to award claimant for its tangible properties, it further proposes to allow an award for "going concern" value, the amount of which is to be determined upon remand. In contrast to the Fifth Avenue Coach Lines, whose lack of earnings was due to the action of the city in denying it a reasonable rate at which it could make a profit (witness the City of New York's highly profitable operation of these bus lines since the higher fare was inaugurated), this enterprise is "inherently incapable of profitable operation". (Matter of City of New York [Fifth Ave. Coach Lines], supra, p. 220.) Economic viability, i.e., the capacity to operate at a profit, is, as the Fifth Ave. opinion makes clear, the sine qua non *481 for an award of going concern value. (Ibid.)[4] This prerequisite condition has not been met here.[5]
The court in reaching today's decision pays lip service to the mandate it is under to determine the award for the New Jersey properties here in question under the requirements of the New Jersey and Federal Constitutions, but it is not an open question what the New Jersey and Federal authorities hold. They expressly reject the notion that special or unique value to the taker alone, the basis upon which the majority's suggested award is founded, may be considered in determining just compensation.
In what is perhaps the leading New Jersey case on this point the Court of Errors and Appeals, speaking in terms so unambiguous that one would not think its view could be disregarded by this court, declared, "Neither the individual advantages to the party acquiring the land, nor the necessity of its acquisition, can be considered in computing the [owner's] loss". (Currie v. Waverly & N. Y. Bay R. R. Co., supra, pp. 395-396.) The court there held that the property owner was improperly barred by the court below from introducing evidence as to the special value of his land to other potential purchasers than the condemnor, and thus reversal was called for (citing, among other cases, Boom Co. v. Patterson, 98 U. S. 403), but its statement of the rule applicable *482 to the instant case leaves nothing to be desired in the way of clarity.
The very same rule was enunciated in Yara Eng. Corp. v. Newark (supra, p. 464), where the Court of Chancery of New Jersey said: "The value [for compensation purposes] to be found is market value, what a willing buyer would pay in cash to a willing seller. In reaching the market value, consideration must be given to all uses to which the land may be put, and the owner be given the benefit of the best and most valuable use. But the special value of the land to the [condemnor], as distinguished from others who may or may not have power to condemn, must be excluded."
In City of Trenton v. Lenzner (supra, p. 476) the Supreme Court of New Jersey reiterated the rule long adopted by the courts of that State, "The measure of compensation is the fair market value", and cited repeatedly and with obvious approval Kimball Laundry Co. v. United States (supra), wherein, it must be recalled, Mr. Justice FRANKFURTER very clearly pointed out that where gain to the taker is unrelated to any deprivation imposed upon the owner it must be rejected as a measure of the public's obligation under the Constitution to provide just compensation. (See 338 U. S. 1, 5, cited at 16 N. J. 465, 476-477.) Later in its opinion the court pointed out that a "foremost factor" in determining fair market value of a taken business "would be its prospective earning power evidenced in considerable part by past earnings." (16 N. J., p. 479.) Just compare this approach with that adopted by today's majority in this court.
Just recently the Appellate Division of the Superior Court of New Jersey, citing Currie and Yara Engineering, had occasion to remark that "Certainly, the State's purposes in acquiring [condemned] property would not be a proper consideration in fixing its value." (State of New Jersey v. Wemrock Orchards, 95 N. J. Super. 25.)
The majority, however, by the device of characterizing the instant case as sui generis, presumes to reject the New Jersey authorities and, rather, imposes its new and radical theory of what "justice" requires upon a situation in which the courts of New York have been authorized only to apply New Jersey and Federal constitutional law, not to create new and revolutionary *483 law. The majority, by implication at least, recognizes that its proposed award is not required by the Federal Constitution (rather, it acknowledges that it must decide this portion of the case as if it were a New Jersey court), and, therefore, its disregard of the New Jersey authorities is in my view tantamount to a violation of the interstate compact authorizing this condemnation and conferring jurisdiction upon this court.
Even further, it can reasonably be argued that the condemnor, this bi-State agency, the creature of the States of New York and New Jersey, whose interests, however, are not necessarily coterminous with the interests of either State, has a right under the interstate compact to have applied even to determination of just compensation for the New York property here in question the law as it existed under settled principles heretofore followed in this State, not as it has just been so drastically changed. An interstate compact is analogous in many respects to a contract (see Dyer v. Sims, 341 U. S. 22, 28-29) and the bi-State legislation constituting this compact, providing that the owner of the property thus taken should "not be awarded for such property any increment above the just compensation required by the constitutions of the United States and of the state or states in which the property is located or has its situs by reason of any circumsances whatsoever" (N. Y. L. 1962, ch. 209, § 14; N. J. L. 1962, ch. 8, § 14), may, especially since the requirements of all three Constitutions were formerly regarded as virtually identical, reasonably be read as incorporating the well-settled rules of law applicable to this case and as barring the sort of judicial amendment of our State's Constitution indulged in here today. The State of New Jersey, which has appeared herein by its Attorney General as amicus curiæ, and the Port Authority, it would seem, have rights under this compact which must take precedence over our judicial solicitude for those financial interests, whoever they may be and wherever they may be located, that have seized upon this railroad as an object for speculation. Determination of these rights presents an important question of Federal law (see Delaware Riv. Comm. v. Colburn, 310 U. S. 419) to which the majority has not even alluded.
I would modify the Appellate Division's award only to the extent of reducing the award by $500,000, an amount representing cash assets of the Hudson Rapid Tubes Corporation not *484 taken in this proceeding, but mistakenly assumed by the Appellate Division to have been taken, and by allowing 6% interest on the New Jersey portion of the award. Other than this, I would affirm its decision based on the law and the facts.
On appeal by claimant Hudson Rapid Tubes Corporation, order of Appellate Division modified, with costs in this court and in the Appellate Division, in accordance with the opinion herein and, as so modified, affirmed, and matter remanded to Special Term for further proceedings in accordance with the opinion herein.
On appeal by claimant Hudson and Manhattan Corporation, order of Appellate Division affirmed, without costs.
In view of the disposition herein, cross appeal of the Port Authority Trans-Hudson Corporation dismissed as academic.
NOTES
[1] This is the only portion of the order of the Appellate Division from which the Hudson and Manhattan Corporation appeals.
[2] Indeed, it appears that upon liquidation it would cost at least $100,000 to plug up the tunnels.
[3] We reached this conclusion despite the fact that the condemnee had never in fact complained about the validity of the rates and without any finding that they were constitutionally invalid.
[4] The argument forcefully advanced in the dissenting opinion is that "[e]conomic viability, i.e., the capacity to operate at a profit, is, as the Fifth Ave.. opinion makes clear, the sine qua non for an award of going concern value." The only opinion in the Fifth Ave. case which clearly outlines that position is the dissenting opinion. Judge BURKE, speaking for the majority, wrote: "The argument made by the respondent [condemnor] that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospects was made long ago and rejected." (18 N Y 2d 212, 223.)
[1] In the course of its construction, the original tunnel "blew out" and was flooded, requiring the installation of a reinforced concrete lining which reduced the bore of the tunnel to 15 feet, 3 inches. This set the standard for the balance of the system, requiring utilization of cars of a size unsuitable to a modern transit system. Additionally, the line has sharp curves and steep grades necessitating reduced operating speeds for its trains. In 1910 the chief engineer for the road told the Institute of Civil Engineers of Great Britain that the road had been planned with single unit trolleys in mind, not multiple unit trains.
[2] For instance, in the face of a 50% increase in the population of Northern New Jersey between 1930 and 1960, this railroad's traffic declined 70%. From the date of this taking, 1962, to 1964, it declined 10%. Its operating losses were staggering, and, if it were not taken over when it was, continued operation would have served only to lessen (probably eliminate) the value of the owners' equity in the enterprise. This decline continued into 1965 (an additional 6%).
[3] The majority recognizes, as did the six Justices below, that these allegedly essential facilities (whose absolute essentiality is open to considerable doubt in light of the severe and continuing passenger decline) would not be reproduced exactly. The "substitute facility" might well be additional automotive tubes and buses, all of which have proven profitable.
[4] In footnote 4 of its opinion the majority attempts to seize upon a remark I made in my Fifth Ave. opinion with respect to "dwindling profits". It fails to note that "dwindling profits" still means profits. The entire thrust of the Fifth Ave. opinion was that the bus company was capable of profitable operation, given a reasonable rate.
[5] Additionally, even the grossest comparison between the Fifth Avenue Coach Lines and the Hudson Tubes operations makes clear the lack of any constitutional requirement for an award of going concern value. The claimant in Fifth Ave. had organized and systematized an enterprise carrying each working day of the year about 1,250,000 passengers. This service was complementary to, not competitive with, the already overcrowded subway facilities in New York City. With a fare increase the enterprise became highly profitable. The Hudson Tubes, on the other hand, have in recent years experienced a continual decline in the number of passengers served. These passengers have been lost to other modes of transportation, especially buses and automobiles. It is conceded that with a fare increase so many passengers would be lost by this railroad that it would be in worse straits. Any value that this railroad once had, or might have had, as a going concern has been lost by the operation of economic forces. (Cf. statement by the dissent in Matter of City of New York [Fifth Ave. Coach Lines], supra, p. 229.) At its taking this was a technologically and functionally obsolescent railroad system.